IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


JOHN BRUMMETT, JR.      )
                             )
v.                        )     No. 3:11-1092
                             )
CAROLYN W. COLVIN,      )
     Acting Commissioner of     )
     Social Security[1]        )


To: The Honorable John T. Nixon, Senior District Judge



### REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's claim for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"), as provided by the Social Security Act.

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff is not disabled under the Act is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 13) should be DENIED.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for former Commissioner Michael J. Astrue as the defendant in this suit.

# I. INTRODUCTION

On March 26, 2009, the plaintiff protectively filed for SSI and DIB, alleging a disability onset date of January 13, 2009. (Tr. 12, 115-126, 136.) His applications were denied initially and upon reconsideration. (Tr. 68-74.) On April 6, 2011, the plaintiff appeared and testified at a hearing before Administrative Law Judge Brian Dougherty ("ALJ") (tr. 25-65), and the ALJ ordered the plaintiff to undergo consultative physical and psychological examinations. (Tr. 59-60, 251-68.) Following the completion of these examinations, the ALJ entered an unfavorable decision on July 6, 2011. (Tr. 12-20.) On November 1, 2011, the Appeals Council denied the plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3.)

# II. BACKGROUND

The plaintiff was born on October 8, 1970, and he was 38 years old as of his alleged disability onset date. (Tr. 136.) He attended school through the eighth grade, obtained a GED, and worked as a construction worker and groundskeeper. (Tr. 28-29, 50.)

## A. Chronological Background: Procedural Developments and Medical Records

On August 16, 2002, the plaintiff fell from a ladder while at work and injured his back. (Tr. 220, 224.) He apparently presented to an emergency room three days later where he was treated and released.[2] *Id.* On September 3, 2002, the plaintiff presented to the Baptist Care Center with "severe pain in his right neck and right middle back" that he rated as an eight out of ten on the pain

---

[2] Emergency room records from this incident are not in the record.

scale. (Tr. 220.) He was diagnosed with cervical and thoracic strain, instructed to start physical therapy, and prescribed medication to relieve pain and inflammation. (Tr. 221.)

On June 17, 2003, the plaintiff presented to Dr. Son D. Le at the Center for Spine, Joint, and Neuromuscular Rehabilitation complaining of "constant pain in the neck and right upper extremity with numbness in the back of his arm." (Tr. 231.) He rated his pain as "moderate" and reported that it was "worse with prolonged sitting and overexertion on the job." *Id.* He reported that "[l]aying on his back relieve[d] his symptoms" and Dr. Le observed that he had a normal gait. *Id.* Dr. Le noted that the plaintiff had decreased cervical range of motion and decreased sensation in his upper right extremities, and he diagnosed the plaintiff with "[c]hronic neck and right upper extremity pain with history of congenital fusion of the C2-3 level." (Tr. 232.) A June 19, 2003 MRI of the plaintiff's cervical spine showed disc herniation and differing levels of cord compression, cord edema, and central stenosis at C3-4, C4-5, and C5-6. (Tr. 222-23.)

On June 24, 2003, the plaintiff was examined by Dr. Robert Dimick at Mid-South Orthopedic Associates with complaints of pain in his neck, back, right arm, and shoulder. (Tr. 224-29.) Dr. Dimick noted "[m]ultiple inorganic inconsistencies" in the plaintiff's medical records, including inconsistent examination findings and a lack of "supporting objective findings." (Tr. 225, 228.) Dr. Dimick diagnosed "[m]ultiple level cervical pathology with marked stenosis at C3-4 secondary to central disk herniation;" "[m]oderate central stenosis at C4-5 and 5-6 with associated herniations;" and "[g]lobal right upper extremity symptoms with negative nerve conduction testing." (Tr. 228.) Dr. Dimick did not, however, recommend surgery, finding that there would be "a very low chance of success of [surgery] significantly decreasing [the plaintiff's] pain or increasing his subjective level of function." *Id.*

On July 16, 2003, Dr. Le diagnosed the plaintiff with "[e]xtensive cervical spondylosis with herniated nucleus pulposus and congenital narrowing of the spinal canal causing cord compression at the C4-5 level" with "lateral foraminal stenosis at multiple levels, right greater than left." (Tr. 230.) Dr. Le prescribed Flexeril, Neurontin, and Celebrex for symptomatic relief.[3] *Id.*

The plaintiff apparently injured his knee sometime in 2005, necessitating surgery.[4] (Tr. 185, 198, 205.) On January 30, 2006, the plaintiff was placed on limited duty at work pursuant to an Injury on Duty ("IOD") report.[5] (Tr. 236.) According to the IOD report, the plaintiff required a sit/stand option, was to perform no squatting or kneeling, and could walk only short distances. *Id.* The report characterized the plaintiff's restrictions as "permanent" but provided for a reevaluation at some point in the future.[6] *Id.*

On June 5, 2008, the plaintiff presented to the Nashville General Hospital emergency room and reported that he had been using a weed-eater when he slipped and twisted his left knee.

---

[3] Flexeril is a skeletal muscle relaxant. Saunders Pharmaceutical Word Book 294 (2009) ("Saunders"). Neurontin is an "anticonvulsant for partial-onset seizures . . . [and] treatment for postherpetic neuralgia." *Id.* at 488. Celebrex is used for the treatment of acute pain and arthritis. Physicians' Desk Reference 3272 (64th ed. 2010).

[4] Treatment records related to the plaintiff's 2005 knee injury are not in the record.

[5] There is some disagreement between the parties regarding who completed the IOD report. The plaintiff contends that Dr. Thomas Limbird completed the report (Docket Entry No. 14, at 3), while the defendant agrees with the ALJ's conclusion that an unnamed "emergency physician" completed the report. Docket Entry No. 15, at 9 n.9; (tr. 16). The Court does not find it necessary to determine who completed the IOD report, however, because the report pertains to the plaintiff's 2005 knee injury and was effectively superceded by Dr. Limbird's January 2009 workplace restrictions. (Tr. 202.)

[6] This portion of the form is not entirely legible. The form appears to indicate that the plaintiff should be reevaluated in one year but provides a prospective reevaluation date of August 23, 2006. (Tr. 236.)

(Tr. 185.) He was in moderate pain and had difficulty ambulating. *Id.* An x-ray showed "no evidence of acute fracture or dislocation" (tr. 189), and he was diagnosed with "[k]nee pain," "[k]nee sprain/strain," and "[d]ifficulty walking due to knee pathology." (Tr. 186.) He was prescribed crutches and pain medication. (Tr. 186-87.) The next day, Dr. Thomas Limbird examined the plaintiff's left knee and observed that it was tender but stable with no effusion and "excellent range of motion." (Tr. 190.) Dr. Limbird believed that "the worst thing he might have done is sprained his medial collateral ligament" but advised the plaintiff to perform sedentary work for "another week or two" before "gradually . . . resum[ing] his previous occupation." *Id.* Dr. Limbird placed the plaintiff on limited duty at work, although the exact limitations are not entirely clear from the record. (Tr. 192, 194, 196.)

The plaintiff returned to Dr. Limbird on January 13, 2009, with complaints of continued intermittent knee pain and swelling. (Tr. 198.) Dr. Limbird noted that an x-ray showed "linear calcitic density in the knee, which may in fact be calcification of [a] cartilaginous loose fragment." (Tr. 198-99.) A January 20, 2009 MRI showed "intact menisci, cruciate, and collateral ligaments;" "mild tricompartmental degenerative changes;" and "small joint effusion." (Tr. 201.) After reviewing the MRI, Dr. Limbird recommended that the plaintiff "continue his current limitations in terms of work, short distances, no prolonged standing, no irregular surfaces and no squatting or stooping." (Tr. 202.) On January 23, 2009, Eddie Walton, the plaintiff's foreman, wrote a letter stating that, given these restrictions, there was no work available for the plaintiff at his current job. (Tr. 169.)

On June 12, 2009, Dr. Marc Bennett performed a consultative orthopedic examination. (Tr. 205-08.) Dr. Bennett observed that the plaintiff walked with a limp and had decreased mobility

but was able to get out of a chair as well as on and off the examination table without difficulty. (Tr. 206.) He wore a soft knee brace on his left knee, which Dr. Bennett found to be "medically necessary," and he had limited range of motion and strength in that knee due to pain. (Tr. 206-07.) He was able to lift ten pounds once with each hand, his grip strength was eighty-three pounds in his right hand and eighty-five pounds in his left hand, and he was able to grasp and manipulate objects normally. (Tr. 206.)

The plaintiff also presented for treatment at Saint Thomas Family Health Care on four occasions between June 26, 2009, and August 2, 2010. (Tr. 237-50.) During this time, he was treated for back and neck pain, hypertension, chest pain, gastroesophageal reflux disease ("GERD"), hyperlipidemia, panic attacks, anxiety, and depression. (Tr. 237-43.)

On July 21, 2009, Dr. Louise Patikas, a Tennessee Disability Determination Services ("DDS") nonexamining consultative physician, completed a physical Residual Functional Capacity ("RFC") assessment. (Tr. 210-18.) Dr. Patikas opined that the plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; and push and/or pull without limitations. (Tr. 211.) Dr. Patikas opined that the plaintiff could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs, but could never climb ladders, ropes, or scaffolds. (Tr. 212.) Dr. Patikas found that the plaintiff's subjective complaints of symptoms were partially credible but found that "[t]he functional restrictions alleged are disproportionate to the clinical findings." (Tr. 217.)

On September 9, 2009, Dr. Nathaniel Robinson, a nonexamining DDS consultative physician, "affirmed" Dr. Patikas' assessment. (Tr. 219.) Dr. Robinson noted that, although the

plaintiff claimed his pain was "more severe and that he [was] having a harder time doing daily chores and activities," he alleged no new illnesses or injuries, submitted no new evidence, and had "no new physical or mental limitations." *Id.*

On October 29, 2009, after the plaintiff complained of shortness of breath and chest pain, he underwent a dual myocardial perfusion exam which indicated possible cardiomyopathy.[7] (Tr. 246.) On November 23, 2009, he underwent a left heart catheterization, left ventrilogram, and coronary angiogram, which revealed "[n]ormal left ventricular size and systolic function with no regional wall motion abnormalities" and "[n]o occlusive coronary disease." (Tr. 244-45.)

On May 12, 2011, Dr. Bruce Davis, a DDS consultative physician, physically examined the plaintiff and completed a Medical Source Statement. (Tr. 251-60.) Dr. Davis observed that the plaintiff had posterior neck pain, but no tenderness or spasm, with "slow neck flexion," extension, lateral flexion, and rotation at 45 degrees. (Tr. 252.) The plaintiff demonstrated "low back pain with slow position changes" but was able to perform straight leg raises to 90 degrees in the sitting and supine positions. *Id.* He had pain, tenderness, and "slow" flexion in his left knee and was unable to complete a squat. *Id.* He also had a limp in his gait and could not complete the heel, toe, and tandem walks "without assistance." *Id.* Dr. Davis found that the plaintiff had reduced grip strength, and he diagnosed him as being overweight and with hypertension, hyperlipidemia, neck and knee injuries, anxiety/panic, depression, kidney stones, and indigestion. (Tr. 252-53.)

Dr. Davis opined that the plaintiff could lift up to twenty pounds occasionally and ten pounds frequently and carry up to twenty pounds occasionally. (Tr. 254.) He found that, in an eight-hour

---

[7] Cardiomyopathy is a general term for disease of the heart muscle. Dorland's Illustrated Medical Dictionary 296 (30th ed. 2003) ("Dorland's").

workday, the plaintiff could sit for six hours, one hour at a time; stand for four hours, thirty minutes at a time, and walk for three hours, fifteen minutes at a time.  (Tr. 255.)  Dr. Davis noted that the plaintiff was medically required to use a cane to ambulate and that, without a cane, he could only ambulate 25-50 feet.  *Id.*  He indicated that the plaintiff could reach, handle, finger, feel, push, and pull with either hand and could operate foot controls frequently with his right foot and occasionally with his left foot.  (Tr. 255-56.)  He opined that the plaintiff could never balance, stoop, kneel, crouch, crawl, or climb stairs, ramps, ladders, or scaffolds.  *Id.*  In Dr. Davis' opinion, the plaintiff should never be exposed to unprotected heights, vibrations, or extreme temperatures and could tolerate only occasional exposure to moving mechanical parts, operation of a motor vehicle, humidity, wetness, dusts, odors, fumes, and pulmonary irritants.  (Tr. 257-58.)  Dr. Davis opined that the plaintiff could shop, care for personal hygiene, prepare a simple meal, feed himself, use public transportation, climb a few steps at a reasonable pace without using a handrail, travel without a companion for assistance, and sort and handle papers and files.  (Tr. 258.)  According to Dr. Davis, the plaintiff could ambulate without using a wheelchair, walker, two canes, or two crutches but could not walk a block at a reasonable pace on rough or uneven surfaces.  *Id.*

On June 3, 2011, Stephen Hopkins, Psy.D., a DDS examining psychologist, performed a psychological evaluation and mental status examination.  (Tr. 261-65.)  The plaintiff reported having had "panic attacks" for the past ten years and that the attacks had "gotten worse in the past 5 years" and could "be set off by [his] getting upset or being around a lot of people."  (Tr. 263.)  The plaintiff said that he had been treated at a hospital for one panic attack and that his symptoms typically included sweating, shaking, "pounding in his chest," and hyperventilation.  *Id.*  The plaintiff also reported that he had dealt with depression "all of [his] life" and that it had gotten worse when his

father died and "when he could not work because of his knee and back injuries." *Id.* The plaintiff said that he can brush his teeth, shower, and dress. (Tr. 264.) He also told Dr. Hopkins that he was able to "do everything necessary for self-care grooming and cleaning of his house, but that he can only mow the lawn on a riding mower (not a push mower) and that he is unable to mop the floor." (Tr. 262.) He reported that he can prepare breakfast but usually skipped lunch and that his wife prepared dinner and washed dishes. (Tr. 264.) He said that he went to the grocery store but spent most of his time "watching TV or laying around." *Id.* He reported that he socialized with his wife, daughter, and "2 or 3 friends" but "[didn't] like to be around too many people." *Id.*

Dr. Hopkins suggested "rule out" diagnoses of panic disorder with agoraphobia, social anxiety disorder, and dysthymic disorder. *Id.* He found that the plaintiff's complaints "appeared mostly credible and consistent with his report," but, after observing that the plaintiff "seemed surprisingly at ease [during the evaluation] for someone claiming a kind of social phobia," Dr. Hopkins noted that "it is possible that he could be exaggerating some of his mental distress to bolster his claim." (Tr. 265.) Dr. Hopkins opined that the plaintiff had moderate limitations in the areas of social interaction and communication in groups as well as mild limitations in his abilities to adapt to change and tolerate stress. *Id.* He opined that the plaintiff was not "completely disabled from any regular employment solely on the basis of his psychological distress." *Id.*

### B. Hearing Testimony

At the hearing on April 6, 2011, the plaintiff was represented by counsel, and the plaintiff and Pedro Roman, a vocational expert ("VE"), testified. (Tr. 25-65.) The plaintiff testified that he has an eighth-grade education and obtained a GED. (Tr. 28-29, 39.) He testified that he suffered

two job-related accidents (tr. 29-30, 44) and that he last worked in 2008, when his employment was terminated because he "couldn't do the work that they wanted [him] to do, and [he] was missing so many days [of work]." (Tr. 40-41.) He explained that he would miss between 5-10 days of work a month due to pain. (Tr. 41.)

The plaintiff testified that he has pain in his neck, back, arms, hands, and knees. (Tr. 39, 44, 46-47.) He testified that his arms, hands, legs, knees, and feet "fall asleep" and "tingle" and that he has difficulty sleeping due to pain. (Tr. 39, 48.) He explained that he often moves between his bed, couch, recliner, and floor and also stands flat against the wall trying to ease his pain. (Tr. 39.) He estimated that his average pain level since January of 2009 was a seven out of ten. (Tr. 41-42.) He explained that he has "good days" when his pain is a five or six out of ten but that he also has approximately ten "bad days" a month when his pain is an eight or nine out of ten. (Tr. 42.) He testified that he has not seen a doctor for his back pain since 2003. (Tr. 47-48.)

The plaintiff testified that he was prescribed Hydrocodone but stopped taking it because it was not helpful and because he wanted to avoid becoming addicted. (Tr. 42.) He said that he was prescribed a knee brace and a cane that he used "[p]retty much" all the time and held in his right hand. (Tr. 43.)

The plaintiff testified that he also suffers from panic attacks and depression. *Id.* He reported that he has "been dealing with" panic attacks for approximately eight years and experiences them multiple times a week (Tr. 44-45.) He described his symptoms as involving hyperventilation, sweating, and "pounding in [his] chest" and said that they are triggered by "being around a lot of people." (Tr. 45.) He related that he takes Clonazepam for panic attacks but that, although the

medicine "[took] the edge off," it "[did not] really help."  *Id.*  He testified that he is depressed

because he is unable to provide for his family.  (Tr. 40.)

The VE classified the plaintiff's past job as a construction worker as heavy, semi-skilled

work and his past job as a groundskeeper as medium, semi-skilled work. (Tr. 50.)  The ALJ asked

the VE whether a hypothetical person with the plaintiff's age, education, and work experience would

be able to obtain work if he could lift twenty pounds occasionally and ten pounds frequently; stand

two hours a day; walk two hours a day for short distances;[8] sit in unlimited amounts; and perform

occasional postural activities; but could not squat, stoop, or kneel from a standing position; use

ladders; or work on irregular surfaces.  (Tr. 51.)  The VE replied that such a person could not

perform the plaintiff's past relevant work but could perform sedentary work.  (Tr. 51-52.)  The VE

testified that "an inability to stoop would . . . significantly erode the occupational base."  (Tr. 52.)

The VE testified that a person with these limitations would be able to work sedentary jobs as an

assembler, charge account clerk, and telephone quotation clerk.  (Tr. 56.)

The ALJ next asked the VE to consider a person with the same limitations but who was

further limited to standing and walking less than two hours a day, needed to take unpredictable

breaks, was limited to occasional handling and fingering, and could perform only simple tasks.

(Tr. 56-57.)  The VE testified that such a person could not perform any work.  (Tr. 57.)

---

[8] The ALJ described the walking restriction to include only "short distances, which would
be equivalent to commuting . . . from work place to work place [and] [n]o . . . duties that require . . .
walking as an actual duty."  (Tr. 51.)

## III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable ruling on July 26, 2011. (Tr. 12-20.) Based upon the record, the ALJ made the following findings:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2.     The claimant has not engaged in substantial gainful activity since January 13, 2009, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3.     The claimant has the following severe impairments: cervical spondylosis with herniated nucleus pulposus and congenital narrowing of spinal canal causing cord compression at C4-5 with lateral foraminal stenosis at multi levels; left knee injury (20 CFR 404.1520(c) and 416.920(c)).

\*\*\*

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

\*\*\*

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except: occasionally lift 20 pounds; frequently lift 10 pounds; standing and walking are limited to 2 hours per day; walking is limited to short distances which would be equivalent to commuting from workplace to workplace with no duties that require walking as an actual duty; no limitations with regard to sitting; postural activities on an occasional basis however should not engage in any squatting, stooping, or kneeling from a standing position; should have no use of ladders at work or have any duties that require performing duties on an irregular surface.

\*\*\*

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

\*\*\*

7.     The claimant was born on October 8,1970 and was 38 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from January 13, 2009, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 14-19.)


# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching her conclusion.  42 U.S.C. § 405(g).  *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010).  The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *Jones v.*

*Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful

activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that he suffers from a severe impairment that meets the twelve month durational requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). *See also Edwards v. Comm'r of Soc. Sec.*, 113 Fed. Appx. 83, 85 (6th Cir. 2004). A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24, 124 S. Ct. 376 (2003) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that he meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff

is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent him from doing his past relevant work, he is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work"); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, he must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that he is unable to perform his past relevant employment, the burden of production shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment and that such employment exists in significant numbers in the national economy. 20 C.F.R. § 404.1512(g); 68 Fed. Reg. 51153, 51154-55 (Aug. 6, 2003). *See also Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997)). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of his functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent him

from doing his past relevant work, if other work exists in significant numbers in the national economy that the plaintiff can perform, he is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of a plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B. The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's claim at step five of the five-step process. At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since his alleged disability onset date. (Tr. 14.) At step two, the ALJ determined that the plaintiff had the following severe impairments: "cervical spondylosis with herniated nucleus pulposus and congenital narrowing of spinal canal causing cord compression at C4-5 with lateral foraminal stenosis at multi levels; [and] left knee injury." *Id.* At step three, the ALJ found that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 15.) At step four, the ALJ determined that the plaintiff was unable to perform his past relevant work as a construction worker or groundskeeper.

(Tr. 18.)  At step five, the ALJ found that the plaintiff could perform the representative jobs of assembler, charge clerk, and telemarketer.[9]  (Tr. 18-19.)

### C. The Plaintiff's Assertions of Error

The plaintiff contends that the ALJ "failed to give appropriate weight to objective evidence, the restrictions of the treating orthopedic physician(s), evaluate the entirety of the medical evidence, or give appropriate weight to lay and vocational testimony."  Docket Entry No. 14, at 7.  These assertions of error are made with virtually no explanation or supporting argument to clarify the plaintiff's position.[10]  *See id.* at 7-8.

### 1. The ALJ gave appropriate weight to the objective evidence of record.

The plaintiff argues that the ALJ "failed to give appropriate weight to objective evidence," but his memorandum does not provide any supporting argument or identify the objective evidence that he contends the ALJ failed to properly credit.  Docket Entry No. 14, at 7.

The ALJ addressed the plaintiff's June 2003 cervical spine MRI showing "large central disc herniation with cord compression and edema and marked central canal stenosis at C3-4 as well as disc herniation and stenosis at C4-5 and C5-6."  (Tr. 17.)  The ALJ also noted the plaintiff's July 2003 diagnoses of "cervical spondylosis with herniated nucleus pulposus and congenital narrowing

---

[9] Although the ALJ referred to this job as "telemarketer," he cited Dictionary of Occupational Titles code 237.367-046, which is titled "telephone quotation clerk" and is the same job identified by the VE.  (Tr. 19, 56.)

[10] Indeed, the plaintiff's memorandum does not contain an "argument" section.  Docket Entry No. 14.

of spinal cord causing compression at C4-5 as well as lateral foraminal stenosis at multi levels." *Id.* While noting that these treatment notes and records significantly predated the plaintiff's alleged onset date and that the plaintiff continued to work full time during this time period, the ALJ in fact credited this objective evidence by finding that the plaintiff's neck impairments were severe. (Tr. 14.)

The ALJ also addressed the plaintiff's left knee injury in 2008, including treatment notes and x-rays from the emergency room. (Tr. 16-17.) The ALJ observed that "[t]he knee was noted to be stable with an excellent range of motion, and an x-ray revealed no evidence of fracture or dislocation." (Tr. 16.) The ALJ referred to Dr. Limbird's opinion that "the worst thing he might have done is sprained his medial collateral ligament." *Id.* The ALJ also noted that, although the plaintiff was restricted to sedentary work for approximately two weeks, when he was released to regular duty, "except for [the plaintiff's] complaints of pain, the doctor found no objective evidence of abnormalities." *Id.*

The ALJ also considered the consultative physical examinations that the plaintiff underwent with Drs. Bennett and Davis. (Tr. 16-17.) The ALJ observed that, during Dr. Bennett's examination, the plaintiff complained of left knee pain and walked with a limp, yet he was able to get out of a chair as well as on and off the examination table without difficulty. *Id.* The ALJ also referred to Dr. Davis' finding that the plaintiff had no tenderness or spasm in his neck. (Tr. 17.)

The ALJ fully addressed the objective evidence in the record, including radiographic scans, treatment notes, and consultative examination findings. The ALJ credited the objective evidence to the extent that he included the plaintiff's neck and knee injuries as severe impairments and

included limitations related to these impairments in the plaintiff's RFC.[11]  The ALJ did not err in his assessment of the objective medical evidence.

### 2. The ALJ properly assessed Dr. Limbird's opinion.

The plaintiff argues that the ALJ "failed to give appropriate weight to . . . the restrictions of the treating orthopedic physician(s)."  Docket Entry No. 14, at 7.  The plaintiff does not specify to whom he is referring as his "treating orthopedic physician(s)," nor does he provide a supporting argument.  The Court infers that the plaintiff is referring to Dr. Limbird because elsewhere in the plaintiff's memorandum he refers to the "severe restrictions" that Dr. Limbird "imposed" on him. *Id.* at 8.

The Regulations provide that the SSA "will evaluate every medical opinion" that it receives. 20 C.F.R. § 404.1527(c).  However, every medical opinion is not treated equally, and the Regulations describe three classifications for acceptable medical opinions: (1) nonexamining sources; (2) nontreating sources; and (3) treating sources.  A nonexamining source is "a physician, psychologist, or other acceptable medical source[12] who has not examined [the claimant] but provides a medical or other opinion in [the claimant's] case." 20 C.F.R. §§ 404.1502, 416.902.  A nontreating source is described as "a physician, psychologist, or other acceptable medical source who has examined [the claimant] but does not have, or did not have, an ongoing treatment relationship with

---

[11] The ALJ also considered the plaintiff's panic attacks but noted that he had not sought mental health treatment and that Dr. Hopkins' consultative examination "revealed no severe mental health problems or diagnoses."  (Tr. 14.)

[12] The Regulations define acceptable medical sources as licensed physicians, both medical and osteopathic doctors, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists.  20 C.F.R. § 404.1513(a).

[the claimant]." *Id.* Finally, the Regulations define a treating source as "[the claimant's] own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." *Id.* An "ongoing treatment relationship" is a relationship with an "acceptable medical source when the medical evidence establishes that [the claimant] see[s], or [has] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." *Id.*

Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating source, as compared to the medical opinion of a non-treating source, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2).[13] *See also Tilley v. Comm'r of Soc. Sec.*, 394 Fed. Appx. 216, 222 (6th Cir. 2010); *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009). This is commonly known as the treating physician rule. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996).

Even if a treating source's medical opinion is not given controlling weight, it is "'still entitled to deference and *must be weighed using all of the factors provided in [20 C.F.R. 416.927] . . . .*'" *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original). The ALJ must consider:

---

[13] Effective March 26, 2012, the numbering for the treating physician rules changed. Section 416.927(d)(2) became section 416.927(c)(2), and the identically worded and interpreted section 404.1527(d)(2) became section 404.1527(c)(2). *See Johnson-Hunt v. Comm'r of Soc. Sec.*, 2012 WL 4039752, at *6 n.6 (6th Cir. Sept. 14, 2012).

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. 2006) (quoting current 20 C.F.R. § 404.1527(c)(2)-(6)). The ALJ must also provide "good reasons" for the resulting weight given to the treating source. Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (citing current 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2)). The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* If an ALJ fails to adhere to this procedural requirement, the case should be remanded for further clarification.[14] *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544-45 (6th Cir. 2004).

Dr. Limbird saw the plaintiff following his knee injury in June 2008 and recommended a two-week reduction to sedentary work before resuming normal duties. (Tr. 192-96.) The plaintiff continued to experience knee pain and returned to Dr. Limbird in January 2009. (Tr. 198.) After reviewing an MRI of the plaintiff's left knee on January 22, 2009, Dr. Limbird recorded in a treatment note that the plaintiff should "continue his current limitations in terms of work, short distances, no prolonged standing, no irregular surfaces and no squatting or stooping."[15] (Tr. 202.)

---

[14] The rationale for the "good reasons" requirement is to provide the claimant with a better understanding of the reasoning behind the decision in his case and to ensure that the ALJ properly applied the treating physician rule. *Wilson*, 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

[15] At the hearing, the plaintiff's attorney told the ALJ that Dr. Limbird was a "worker's compensation physician" and that the limitations contained in his January 22, 2009 treatment note constituted the plaintiff's permanent restrictions. (Tr. 31, 33-36.)

The plaintiff argues that the ALJ "failed to give appropriate weight" to Dr. Limbird's restrictions. Docket Entry No. 14, at 7. The Court seriously questions whether Dr. Limbird is a treating source and whether his January 22, 2009 treatment note constitutes a medical opinion concerning the plaintiff's permanent functional limitations. Nevertheless, the plaintiff's argument fails because the ALJ incorporated Dr. Limbird's restrictions almost verbatim into the plaintiff's RFC. Among other limitations, the ALJ found that the plaintiff could stand two hours a day, walk two hours a day and for only short distances, and could not perform duties on an irregular surface or that required stooping or squatting from a standing position. (Tr. 15-16.) These limitations are virtually identical to those imposed by Dr. Limbird. (Tr. 202.)

The ALJ also considered the opinions of the examining and nonexamining consultative physicians. (Tr. 16-18.) As discussed above, the ALJ considered Dr. Bennett's consultative orthopedic examination in June 2009, at which the plaintiff walked with a limp but was able to get on and off the examination table without difficulty.[16] (Tr. 16-17, 206.) The ALJ also considered the opinion of Dr. Patikas, a nonexamining DDS consultative physician, who opined that the plaintiff could lift and/or carry up to twenty pounds occasionally and ten pounds frequently; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; never climb ladders, robes, or scaffolds; and occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs.[17] (Tr. 17, 210-18.) The ALJ gave Dr. Patikas' opinion little weight, finding it inconsistent with the medical evidence of record showing "a more limited ability to stand and/or walk." (Tr. 17.)

---

[16] Dr. Bennett did not provide specific opinions regarding the plaintiff's work-related functional limitations. (Tr. 205-08.)

[17] As the ALJ noted, Dr. Patikas' opinion was later "affirmed" by Dr. Robinson, who was also a nonexamining DDS consultative physician. (Tr. 17, 219.)

Finally, the ALJ considered the opinion of Dr. Davis, a consultative examining physician. (Tr. 17-18, 251-59.) Dr. Davis opined that the plaintiff could lift up to twenty pounds occasionally and ten pounds frequently; carry up to twenty pounds occasionally; sit for six hours in an eight-hour workday for one hour at a time; stand for four hours in an eight-hour workday for thirty minutes at a time; walk for three hours in an eight-hour workday for fifteen minutes at a time; occasionally reach, handle, finger, feel, and push/pull; frequently operate foot controls with his right foot; occasionally operate foot controls with his left foot; never climb, balance, stoop, kneel, crouch, or crawl; and never walk on rough or uneven surfaces. (Tr. 254-56, 258.) Dr. Davis also opined that the plaintiff should avoid exposure to unprotected heights, temperature extremes, and vibrations and that he should have only occasional exposure to moving mechanical parts, operating a motor vehicle, humidity/wetness, and pulmonary irritants. (Tr. 257-58.) The ALJ found that Dr. Davis' opinion was "generally consistent" with the record and gave it weight to the extent that it was consistent with the plaintiff's RFC. (Tr. 18.) However, the ALJ found that Dr. Davis' opinion regarding the plaintiff's ability to handle and finger was contradicted by Dr. Bennett's findings and objective grip strength testing, so he gave these limitations no weight. *Id.* On the other hand, the ALJ found that the plaintiff had more significant standing and walking limitations than Dr. Davis found. *Id.* Consequently, the ALJ included limitations restricting the plaintiff to "sedentary positions that are performed from a seated position." *Id.*

The ALJ did not err in evaluating the medical opinion evidence. The ALJ considered each of the medical opinions in the record and thoroughly explained the weight that he afforded each opinion and the reasons for that weight. The ALJ adopted Dr. Limbird's restrictions and generally found that the plaintiff had more significant limitations than those suggested by the consultative

24

physicians. There is substantial evidence in the record to support the ALJ's assessment of the medical opinion evidence.

### 3. The ALJ properly evaluated the medical evidence.

The plaintiff argues that the ALJ failed to "evaluate the entirety of the medical evidence." Docket Entry No. 14, at 7. The plaintiff provides no support for this argument. As set out elsewhere in this Report and Recommendation, the ALJ fully addressed the medical evidence of record, including treatment notes, objective evidence, the plaintiff's testimony, and the opinions of treating and consultative sources.

### 4. The ALJ properly assessed the plaintiff's testimony.

The plaintiff argues that the ALJ failed to "give appropriate weight to lay . . . testimony." Docket Entry No. 14, at 7. The plaintiff does not explain which "lay testimony" he is referring to and does not provide a cogent supporting argument. He makes a passing reference to "objective evidence . . . support[ing] the [plaintiff's] allegations of disabling pain" and cites generally to regulations and case law for evaluating a plaintiff's subjective complaints of pain. *Id.* at 7-8. Because the plaintiff was the only person other than the VE to testify at the hearing, the Court interprets the plaintiff's argument to be that the ALJ erred in assessing his subjective complaints of pain.

An ALJ is charged with evaluating the credibility of the plaintiff at the hearing, and the ultimate decision of credibility rests with the ALJ. The ALJ's credibility finding is entitled to deference "because of the ALJ's unique opportunity to observe the claimant and judge [his]

subjective complaints." *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (internal citations omitted). However, "[i]f the ALJ rejects the claimant's complaints as incredible, he must clearly state his reason for doing so." *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp. 2d 954, 958 (N.D. Ohio 2003) (citing *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994)).

Social Security Ruling 96-7p emphasizes that credibility determinations must find support in the record, and not be based upon the "intangible or intuitive notion[s]" of the ALJ. 1996 WL 374186, at *4. In assessing the plaintiff's credibility, the ALJ must consider the record as a whole, including the plaintiff's complaints, lab findings, information provided by treating physicians, and other relevant evidence. *Id.* at *5. Consistency between the plaintiff's subjective complaints and the record evidence "tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect." *Kalmbach v. Comm'r of Soc. Sec.,* 2011 WL 63602, at *11 (6th Cir. Jan. 7, 2011). The ALJ must explain his credibility determination such that both the plaintiff and subsequent reviewers will know the weight given to the plaintiff's statements and the reason for that weight. Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *4.

Both the SSA and the Sixth Circuit have enunciated guidelines for use in analyzing a plaintiff's subjective complaints of pain. *See* 20 C.F.R. §§ 404.1529; 416.929; *Felisky*, 35 F.3d at 1037. While the inquiry into subjective complaints of pain must begin with the objective medical record, it does not end there. The Sixth Circuit, in *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847 (6th Cir. 1986), set forth the basic standard for evaluating such claims.[18] The *Duncan* test has two prongs. The first prong is whether there is objective medical evidence of an

---

[18] Although *Duncan* only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987. *See Felisky*, 35 F.3d at 1039 n.2.

underlying medical condition. *Felisky*, 35 F.3d at 1039 (quoting *Duncan*, 801 F.2d at 853). The second prong has two parts: "(1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." *Id.* This test does not require objective evidence of the pain itself. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)).

The ALJ satisfied the first prong of the *Duncan* test when he concluded that the plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms. (Tr. 16.) Given that the second prong of the *Duncan* test consists of two alternatives, the plaintiff must only meet one of the following two elements: the objective medical evidence "confirms the severity of the alleged pain arising from the condition" or the "objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." The SSA provides a checklist of factors to assess symptoms, including pain, in 20 C.F.R. § 404.1529(c). The ALJ cannot ignore a plaintiff's statements detailing the symptoms, persistence, or intensity of his pain simply because current objective medical evidence does not fully corroborate the plaintiff's statements. 20 C.F.R. § 404.1529(c)(2). Besides reviewing medical

records to address the credibility of a plaintiff's symptoms of pain, an ALJ must review the entire case record in light of the seven factors set forth in 20 C.F.R. § 404.1529(c)(3).[19]

Here, the ALJ set forth a detailed analysis evaluating several factors in 20 C.F.R. § 404.1529(c)(3) and concluding that the plaintiff's subjective complaints of pain were not disabling. (Tr. 16-18.) Relying on the plaintiff's testimony and the medical record, the ALJ discussed, *inter alia*, the plaintiff's daily activities; the location, duration, frequency, and intensity of the plaintiff's pain; the plaintiff's treatment history; and several other factors regarding the plaintiff's allegations of pain. *Id.* The ALJ concluded that the plaintiff's allegations were not credible to the extent they were inconsistent with the ALJ's RFC formulation. (Tr. 16.) The ALJ complied with *Duncan*, Social Security Ruling 96-7p, and 20 C.F.R. § 404.1529 in evaluating the plaintiff's subjective complaints.

**5.  The ALJ properly assessed the VE's testimony.**

Finally, the plaintiff argues that the ALJ "failed to give appropriate weight to . . . vocational testimony." Docket Entry No. 14, at 7.

The Regulations allow the ALJ to rely on the testimony of a VE at step five to determine whether the plaintiff is able to perform any work. 20 C.F.R. § 416.960(c). The VE's testimony, in

---

[19] The seven factors include: (i) the plaintiff's daily activities; (ii) the location, duration, frequency, and intensity of the plaintiff's pain or other symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness and side effects of any medication the plaintiff takes or has taken to alleviate pain or other symptoms; (v) treatment, other than medication, plaintiff received or has received for relief of pain or other symptoms; (vi) any measures plaintiff uses or has used to relieve pain or other symptoms (e.g. lying flat on his back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) other factors concerning the plaintiff's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

response to the ALJ's hypothetical question, will be considered substantial evidence "only if that [hypothetical] question accurately portrays [the plaintiff's] individual physical and mental impairments." *White v. Comm'r of Soc. Sec.*, 312 Fed. Appx. 779, 785 (6th Cir. Feb. 24, 2009) (quoting *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)). *See also Anderson v. Comm'r of Soc. Sec.*, 2010 WL 5376877, at *3 (6th Cir. Dec. 22, 2010) (citing *Felisky*, 35 F.3d at 1036) ("As long as the VE's testimony is in response to an accurate hypothetical, the ALJ may rely on the VE's testimony to find that the [plaintiff] is able to perform a significant number of jobs."). Although a hypothetical must accurately portray a plaintiff's impairments, an ALJ "is required to incorporate only those limitations that he accepts as credible." *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 425, 429 (6th Cir. Feb. 9, 2007) (quoting *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

The plaintiff does not provide an argument in support of his contention but suggests that the ALJ used the Medical-Vocational Guidelines in making his decision.[20]  Docket Entry No. 14, at 7. However, although the ALJ referred to the Medical-Vocational Guidelines, he specifically relied on the VE's testimony that a person with the plaintiff's age, education, work experience, and functional limitations would be able to work as an assembler, charge clerk, and telephone quotation clerk. (Tr. 18, 19, 50-51, 56.)  The ALJ's hypothetical question accurately reflects the plaintiff's limitations, and the ALJ was entitled to rely on the VE's response.

The plaintiff also points to the ALJ's second hypothetical, which included a requirement that the hypothetical individual would need to take unpredictable breaks due to back pain and panic

----

[20] The plaintiff does not explain why it would have been improper for the ALJ to use the Medical-Vocational Guidelines but argues only that "no younger individual that was not illiterate of communicate [*sic*] in English could ever meet [the Guidelines]."  Docket Entry No. 14, at 7.

attacks, could perform only simple tasks, and could handle and finger on an occasional basis. Docket Entry No. 14, at 6; (tr. 56-57). The VE testified that a person with these limitations would be unable to perform any work. (Tr. 57.) However, the ALJ found that these additional limitations did not accurately describe the plaintiff's physical and mental impairments. Consequently, the VE's testimony to this hypothetical question is not considered substantial evidence. *See White*, 312 Fed. Appx. at 785. The ALJ properly relied on the VE's testimony in finding that the plaintiff is able to perform certain jobs.

## IV. RECOMMENDATION

For the above stated reasons it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 13) be DENIED and that the Commissioner's decision be affirmed.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,

JULIET GRIFFIN
United States Magistrate Judge